IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**DAVID N. FITZENREITER,**                        Case No. 3:16 CV 2442

    Plaintiff,

    v.                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                        MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff David Fitzenreiter ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB and SSI in September 2013, alleging a disability onset date of August 31, 2008. (Tr. 236-46). His claims were denied initially and upon reconsideration. (Tr. 88-153; 156-84). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 185). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 18, 2015. (Tr. 33-87). On October 7, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 11-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5);

*see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on October 5, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background and Testimony</u>

Plaintiff was born in May 1961, making him 47 years old at his alleged onset date. (Tr. 88). He had a high-school education (GED) and past work as a forklift operator, material handler, pressing machine operator, and food packer. (Tr. 24, 39-45, 78).

In an October 2013 function report, Plaintiff explained he was limited in his ability to work because, among other things: "I don't understand instruction [sic] sometimes and get anxious and depressed. I forget thing [sic] more." (Tr. 302). He reported activities of caring for pets, yard work, laundry, preparing meals, grocery shopping, and chatting online. (Tr. 303-06). Plaintiff reported he had trouble getting along "sometimes with sibling [sic] and neighbor [sic] who gossip. And game player [sic] at work" and that he was "more anti-social" and did not go out. (Tr. 307). He also indicated he could pay attention for ten to fifteen minutes, but had difficulty following instructions because "[s]ometimes it gets confusing, can't remember as well as I used to." *Id.* In response to a question about how he got along with authority figures, he responded: "very well, bosses most of the time but not always", and he indicated he had never been fired or laid off for not getting along with people. (Tr. 308).

At the August 2015 hearing before the ALJ, Plaintiff testified he lived alone in a home owned by his mother. (Tr. 37). Plaintiff testified he believed he could not work due to anxiety and depression. (Tr. 45-46). He explained what had changed since 2008 to the present affecting his ability to work was:

> I've just had a lot of eye opening experiences. I've gone over things in my past. I found out things that were done to me that I never knew by people recently and it

2

has kind of been on my mind a lot. I try to keep busy so I don't think about it, but it really hurts a lot to think about some of the things that I found out that were done to me.

\*\*\*

What's different is that I'm seeing things in a whole new light. I don't see things the way I used to see things before. I have a more negative outlook on life and everything.

\*\*\*

I fear about people and the games and stuff. I don't want to be part of all that, but it just seems to be a normal thing everywhere I go. Either that or I'm imagining it. I might be imagining it.

(Tr. 69-71). He also testified he could not work: "Because I just have a hard time concentrating. Concentrating on the job. Being in one place for too long. . . . I don't know, I just don't feel comfortable with it anymore." (Tr. 73).

Plaintiff testified he saw his psychiatrist, Dr. Williams, every twelve weeks, but "[s]ometimes it's less than that" and saw a therapist weekly or biweekly. (Tr. 50-51). Plaintiff had been under the care of the Stress Center since 1989 (for panic attacks), and had been seeing Dr. Williams specifically for fifteen years. (Tr. 64).

Plaintiff testified he had memory problems, "forgetting things more often and not remembering stuff and losing things", but did not need reminders to take his medication. (Tr. 53-54). With regard to concentration, Plaintiff said he tended "to drift off and think about other things that [he's] not supposed to be - - shouldn't be - - [he had] a hard time focusing on what [he] should be doing." (Tr. 54). These concentration problems went "all the way back to grade school." *Id.*

Plaintiff testified he had trouble understanding instructions in past jobs, and had always had trouble making decisions. (Tr. 55, 67). He also had trouble getting along with other people. (Tr. 56) ("And a lot of it just comes from my own frustrations because I can't seem to figure out what is wanted from them. And it's not necessarily their fault, it's just the frustration leads to - - "). Plaintiff said he "[s]ometimes" had trouble with supervisors "when they take credit for

something [he] did" and "[s]ometimes" had trouble with coworkers "when they don't pull their fair share." (Tr. 65). He also sometimes felt like coworkers were out to get him, and had previously left a job because of high anxiety. (Tr. 67). He explained he had left a prior job because: "People play head games. People try to get your job. People sabotage things so you get in trouble to get your job. You go to personnel and nothing is done." (Tr. 44-45). He testified he felt like he was "always a little paranoid and watching over [his] back" and had "a hard time concentrating and . . . a hard time understanding what someone wants from [him]." (Tr. 46).

Plaintiff also testified to anger issues, but anger management had been helpful. (Tr. 71-72).

Plaintiff had "always had issues with [his] brothers and sisters", which he attributed to the age difference between them. (Tr. 66). He said he had one friend, and that he "always seemed to be comfortable with having just one friend. . . . I just felt like I've never needed more than that." *Id.*

Plaintiff testified he had a nervous breakdown in 1989, for which he was hospitalized overnight. (Tr. 56, 73). He still had anxiety attacks "once in awhile", but "not as severe as what they were back in 1989". (Tr. 57). He could usually recover from them in "fifteen minutes or so". *Id.*

Plaintiff testified he checked on his mother daily, and helped her with household chores like laundry and meal preparation. (Tr. 58). He also performed chores at his own house, though not as much as he thought he should: "Dusting I don't like and I don't sweep as often as I should. I just mopped the kitchen floor, so I got that done. Dishes are never ending and I will never catch up with that in my life. I'm just not - - I have a problem keeping up with that." (Tr. 59). Plaintiff also cared for birds and fish. (Tr. 60).

Plaintiff testified he grocery shopped twice per month, and it took him approximately an hour. (Tr. 59-60). He would go early in the morning to avoid crowds. (Tr. 60); *see also* Tr. 73 ("I like to shop in peace and if a lot of people are around and stuff it tends to make me nervous. It always did.").

Relevant Medical Evidence[1]

The record reflects (as Plaintiff testified to) a long history of mental health treatment. The Transcript contains records from Plaintiff's treating physician, George Williams, M.D., of Fulton County Health Center, starting in January 2008. *See* Tr. 460.

The record contains two treatment notes from Dr. Williams in 2008 (prior to Plaintiff's alleged onset date). (Tr. 459-60). At both visits, Dr. Williams noted "[m]ood and mental status overall were fairly good". *Id.* In January 2008, Plaintiff reported he had been working full-time for five months, and felt "his mood has been relatively stable." (Tr. 460). In July, Plaintiff was still working, and was "[a]ble to keep up with responsibilities within his own home as well as his parents." (Tr. 459). At both visits, Dr. Williams assessed "[p]anic disorder, stable", and continued Plaintiff on his current medication of Cymbalta. (Tr. 459-60).

The record contains three treatment notes from Dr. Williams in 2009. (Tr. 456-58). In February, Plaintiff did not have a job, but was looking. (Tr. 458). He was "staying active online with some contacts". *Id.* In July, Plaintiff reported he was "still struggling from his previous job". (Tr. 456). He described interpersonal problems that led to his departure ("he ended up having to leave there because it was becoming extraordinarily more difficult in light of the fact that there

_____

1. Plaintiff's brief challenges only the ALJ's determination regarding his mental impairments. *See* Doc. 12. Plaintiff has waived argument on issues not raised in his opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). As such, the undersigned only summarizes the mental health records here.

was an ongoing perception from many of the employees that the patient was 'a narc.'"). *Id.* In October, Plaintiff was still job-searching, and was "preoccupied with taking care of his parents." (Tr. 457). Plaintiff's "[m]ood and mental status" was "fairly good" (Tr. 457-58), or "about the same" (Tr. 456). In 2009, Plaintiff reported his medication was "helpful" (Tr. 458), and made his mood "fairly stable" (Tr. 457). At each visit, Dr. Williams again assessed "[p]anic disorder, stable", and continued Plaintiff on Cymbalta. (Tr. 456-58).

Plaintiff again saw Dr. Williams three times in 2010. (Tr. 453-55). In April, Plaintiff was looking for work, but "feeling as though the odds are stacked against him" and continuing "to have some issues with feeling as though there are others in the community that have less than a positive orientation towards him." (Tr. 455). Dr. Williams observed that Plaintiff "seems to have some degree of suspicion regarding others within the community which may or may not be public knowledge issues." *Id.* In September, Plaintiff was still looking for work, having some difficulty sleeping, and Dr. Williams noted "his mood has been up and down although for the most part not to any significant extreme." (Tr. 454). Dr. Williams added a trial of Saphris at bedtime to address sleep, "as well as some of the suspicious thoughts that he has had over time." *Id.* In December, Plaintiff expressed frustration over physical medical issues. (Tr. 453). He had not been taking the Saphris, but his sleep had been "good". *Id.* At the 2010 visits, Plaintiff's mood and mental status were "about the same" (Tr. 455), "fair" (Tr. 454), and "fairly good" (Tr. 453). In April and December, Dr. Williams assessed "[p]anic disorder, stable", (Tr. 453, 455) and in September, he assessed "[p]anic disorder" (Tr. 454). Plaintiff continued to take Cymbalta. (Tr. 453-55).

In 2011, Plaintiff again saw Dr. Williams three times. (Tr. 450-52). In April, Plaintiff reported he had been "fairly good from a mood point of view". (Tr. 452). In July, Plaintiff reported he had filed for bankruptcy, and had started a new job. (Tr. 451). In October, Plaintiff reported he

had left the job due to erratic hours, and "he could not handle that physically", but was looking for another job. (Tr. 450). "From a mood point of view, he [was] pleased that he [was] doing okay." During this time, Plaintiff's mood and mental status were "fairly good" (Tr. 450, 452), and "fairly stable" (Tr. 451). In April and October, Dr. Williams assessed dysthymic disorder, and panic disorder (without agoraphobia). (Tr. 450, 452).[2] In April, he explicitly noted they were "[b]oth stable." (Tr. 452). Dr. Williams continued the Cymbalta prescription, which Plaintiff reported to be helpful (Tr. 450-52), and provided more Saphris samples (Tr. 451-52).

Plaintiff saw Dr. Williams four times in 2012. (Tr. 446-49). In April, Plaintiff reported he had worked in December 2011, but it ended because "they did not have enough work to keep on the temporary employees". (Tr. 449). Plaintiff was hopeful that he would be hired back, and reported he "continues to do what he can . . . to help out his parents and keep up with the property." *Id.* He reported no panic attacks, no significant symptoms of depression, and believed his mood to be "manageable/good." *Id.* In July, Plaintiff reported "not much has changed overall", and described some physical health issues. (Tr. 448). Dr. Williams noted "[o]therwise, he remains active" and that he was scheduled to return to work the following week. *Id.* In September, Plaintiff was working part-time, and hopeful for a full-time job. (Tr. 447). He reported things were "largely unchanged" and "going okay." *Id.* In December, Plaintiff was "okay . . . from a mood point of view", but frustrated with his inability to obtain and maintain employment. (Tr. 446). He "believe[d] that . . . people that he knows that have intentionally undermined his credibility with others which has put his employment opportunities at risk" and he was "thinking about applying for disability even." (Tr. 446). During this time, Plaintiff's mood and mental status were "good" (Tr. 449), "fairly good" (Tr. 446, 448), and "fair/good" (Tr. 447). Dr. Williams continued to assess

---

2. The "assessment" portion of the July 2011 treatment note is blank. (Tr. 451).

panic disorder, without agoraphobia, and dysthymia. (Tr. 446-49). He specifically noted Plaintiff's dysthymia to be stable at each visit *id.*, and in September noted "[b]oth stable" (Tr. 447). Dr. Williams continued to prescribe Cymbalta. (Tr. 446-49).

Plaintiff also saw Dr. Williams four times in 2013. (Tr. 442-45, 495-96).[3] In March, Plaintiff reported "not much has changed overall", he was looking for work, and had been "occupying himself with tending to the needs of his elderly parents." (Tr. 445). In May, Plaintiff reported "overall he has been doing fairly well", was supporting his parents, and was still job-searching. (Tr. 444).[4] In August, Dr. Williams noted Plaintiff had anxiety with restlessness but depression was not clinically an issue. (Tr. 442).[5] Plaintiff himself reported mild anxiety, moderate depressed mood, and moderate stressors due to work, family, and financial issues. *Id.* Dr. Williams noted Plaintiff had "some ideas of reference, although [he could] not say [it] breaches into psychosis". *Id.* His attitude was "cooperative yet somewhat irritable", his attention was "good", his speech "clear", insight "fair", judgment "appropriate", thought process "logical, with some ideas of reference", and thought content "appropriate to topic." *Id.* Dr. Williams noted Plaintiff's "mood/condition" was "fairly stable over time, no obvious changes relative to previous visit." (Tr. 443). In November, Dr. Williams noted Plaintiff had "ongoing anxiety and distress related to family dynamics." (Tr. 495). Plaintiff's father had died six days prior, and Plaintiff thought his siblings were "joined in an approach to try to undermine his role within the family." *Id.* Plaintiff also reported a domestic violence restraining order against him as a result of an argument with his

---

3. There are also duplicates of some of these records. *See* Tr. 493-94, 499-500, 567-70.
4. A handwritten treatment note completed by Dr. Williams indicates a long-term goal of "maintain[ing] current level of functioning"; Plaintiff had a "significant" response to treatment and he should continue treatment. (Tr. 578).
5. The records become more detailed starting in August 2013, seemingly due to a change in the format of the office treatment notes.

siblings, "even though he did not touch anyone." *Id.* Plaintiff was "trying to do what he can to be supportive" of his mother. *Id.* During this time, Plaintiff's mood and mental status were "good" (Tr. 445), "fairly good" (Tr. 444), euthymic, and "fairly stable" (Tr. 442-43), and "fairly stable despite the recent psychosocial stressors" (in November 2011) (Tr. 495). Dr. Williams continued to assess panic disorder, without agoraphobia, and dysthymia, noting them to be "stable" (Tr. 444-45), and "fairly stable" (Tr. 443). Dr. Williams continued to prescribe Cymbalta (Tr. 442-45, 495-96), which Plaintiff described as helpful (Tr. 444-45, 495).

Plaintiff also began counseling in October 2013, undergoing an assessment with Julia Rossow, LSW. (Tr. 471-85).[6] Plaintiff reported struggling with family problems, and his father's illness. (Tr. 471). Plaintiff believed his siblings had contacted his physicians to "stick their noses in when they don't belong". *Id.* He wanted to "learn to set boundaries", "obtain inner spiritual peace", and "work through how to deal with death". *Id.* Plaintiff reported his support system consisted of his pastor and his parents, but he lacked social or peer support. *Id.* He reported he "watch[ed] church live", "listen[ed] to soft music" and enjoyed gardening. *Id.* Plaintiff was unemployed (Tr. 471); when he had a job his attendance was normal, performance was good, but he would "worry constantly about who is going to play me next" (Tr. 472). On mental status examination, Ms. Rossow noted: well-groomed appearance; average demeanor, eye-contact, activity, and speech; moderate persecutory delusions; logical and tangential thought process; euthymic mood; full affect; cooperative behavior; and mildly impaired attention and concentration. (Tr. 481). Ms. Rossow noted Plaintiff needed to develop symptom management, employment, and social support skills. (Tr. 476). In support, she explained Plaintiff had "[i]nvasive thoughts", "delusions that people have ulterior motives and they 'play' him", and that Plaintiff was "unable

---

6. There is also a duplicate copy of this record. *See* Tr. 512-25.

to work due to paranoid beliefs that co-workers pretend to be friends and get close to him and then 'play' him." *Id.*; *see also* Tr. 477. Ms. Rossow diagnosed panic disorder without agoraphobia and dysthymic disorder, and noted to rule out paranoid personality disorder and delusional disorder, persecutory type. (Tr. 478). She recommended Plaintiff continue treatment with his primary care provider and psychiatrist for pharmacological management and referred him to outpatient mental health therapy. *Id.*

Plaintiff continued counseling with Ms. Rossow through the rest of 2013. (Tr. 526-37). Throughout this time period, Ms. Rossow never indicated Plaintiff's mood or affect was "notable". (Tr. 526, 528, 530, 532, 534). During these sessions, Plaintiff reported he was pursuing disability, and discussed his father's illness and death, and issues with his family. (Tr. 526-37). Plaintiff reported his "feelings that he is naïve and people are 'out to get him'". (Tr. 526).

Plaintiff continued to see both Dr. Williams and Ms. Rossow in 2014. *See* Tr. 491-92[7], 559-66 (Dr. Williams); Tr. 539-43; 638-718 (Ms. Rossow).

In February, Plaintiff reported to Dr. Williams attending anger management classes after being convicted of disorderly conduct related to a family dispute. (Tr. 491). He found the anger management classes helpful. *Id.* In April, Plaintiff reported concerns about his mother's health, and problems with his siblings continued. (Tr. 563). In July, Plaintiff reported he "continue[d] to believe that his 3 siblings are conspiring against him and their mother", and thought his siblings had "bugged" his phone. (Tr. 561). Dr. Williams noted Plaintiff "does have some fairly well developed and persistent beliefs with a persecutory theme although not so unusual as to characterize them as delusional without evidence to support this to be the case. A more likely consideration would be paranoid personality traits/disorder." (Tr. 561-62). In October, Plaintiff

_____

7. This record is duplicated multiple times. *See* Tr. 503-04; 565-66.

again reported fears that his siblings were conspiring against him. (Tr. 559). Throughout 2014, Dr. Williams noted Plaintiffs mood remained consistent, and was euthymic or stable. (Tr. 491, 559, 561, 563). Dr. Williams continued to diagnose panic disorder without agoraphobia and dysthymic disorder, and continued Plaintiff's Cymbalta prescription. (Tr. 491, 559, 561-62, 563-64).

Plaintiff attended counseling sessions with Ms. Rossow throughout 2014. *See* Tr. 539-43, 638-718. In these visits, he discussed anger and anxiety triggers; family dynamics, including anxiety surrounding his mother's health; and paranoia regarding his siblings' perceived actions, as well as coping skills to address these issues. *Id.* At each visit except one, Ms. Rossow checked a box indicating there was "[n]o significant change [in Plaintiff's condition] from last visit" and did not check the boxes indicating anything notable about Plaintiff's mood/affect, thought process/orientation, or behavior/functioning. (Tr. 539, 542, 641, 643, 646, 648, 650, 652, 654, 657, 659, 661, 663, 665, 667, 669, 671, 673, 675, 677, 679, 681, 684, 686, 688, 690, 693, 696, 698, 700, 702, 704, 706, 708, 711, 713, 717). At a December 2014, visit, Ms. Rossow checked a box indicating Plaintiff's "mood/affect" was notable, indicated Plaintiff reported increased anxiety and restlessness, and discussed coping skills. (Tr. 715).

Plaintiff continued to see both Dr. Williams and Ms. Rossow in 2015. *See* Tr. 555-58, 772, 774 (Dr. Williams); Tr. 719-54 (Ms. Rossow).

In January, Plaintiff reported frustration to Dr. Williams over "the lack of family cohesiveness and possibility that they may be attempting to limit him from gaining access to his guns", which were taken away after the domestic violence charge. (Tr. 557). In July, Dr. Williams noted Plaintiff "states he has continued to do well overall relative to his last appt." (Tr. 555). He reported counseling to be "helpful in general (not just with anger management)". *Id.* In July, Plaintiff again reported "not much has changed". (Tr. 772). He expressed frustration with "what

he views as overly intrusive behavior from his sister" and worried about what might happen if his mother died and his sister gained control of the estate, as he was somewhat financially dependent on his mother. *Id.* In October, Plaintiff again stated he had "been managing okay" since his last appointment. (Tr. 774). He again expressed "some unresolved issues regarding trust with his siblings", but his mother had been "supportive emotionally and financially". *Id.* In January, May, and July, Dr. Williams continued his prior assessments of panic disorder without agoraphobia and dysthymic disorder. (Tr. 555, 557, 772). In October, he added "[m]ajor depression, recurrent – stable." (Tr. 774). Throughout 2015, Plaintiff's mood was stable and euthymic, with no evidence of psychosis or delusional thought process. *See* Tr. 557; 555 ("[t]hought process reality based"); 772 ("mood appears euthymic. No real change in mental state relative to his previous appt."); 774 ("Thought process reasonable, no evidence of rank paranoia or any delusional content."). Dr. Williams continued Plaintiff on Cymbalta, which he found helpful. (Tr. 555-58, 772, 774).

Plaintiff's 2015 counseling sessions with Ms. Rossow continued to address anger, anxiety, and coping skills; they also continued to address Plaintiff's family dynamic issues and beliefs that his siblings were out to get him. *See* Tr. 719-54. At each visit, Ms. Rossow checked a box indicating there was "[n]o significant change [in Plaintiff's condition] from last visit" and did not check the boxes indicating anything notable about Plaintiff's mood/affect, thought process/orientation, or behavior/functioning. (Tr. 719, 721, 723, 725, 727, 730, 732, 734, 737, 739, 742, 745, 747, 749, 751, 753).

Plaintiff saw Dr. Williams again in January 2016 (after the ALJ's decision). (Tr. 775). Plaintiff reported worries about his mother's health, and "admit[ted] that assisting with his mother and her care needs and multiple doctor [appointments] has been wearing on him." *Id.* Dr. Williams

noted Plaintiff's medication to be helpful, and continued prior diagnoses: "[d]ysthymia, [p]anic do, [m]ajor depression recurrent-stable." *Id.*

*Opinion Evidence*

*Treating Providers*

In October 2013, Dr. Williams completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)". (Tr. 461-63).[8] He opined Plaintiff had: mild limitation in the ability to understand, remember, and carry out simple instructions; moderate limitation in the ability to make judgments on simple work-related decisions; and marked limitation in the ability to understand, remember, and carry out complex instructions, as well as to make judgments on complex work-related decisions[9]. (Tr. 461). For findings in support, Dr. Williams wrote: "multiyear history of working with patient to treat his depression and anxiety". *Id.* Dr. Williams also opined Plaintiff had moderate limitation in the ability to interact appropriately with the public; but marked limitation in the ability to interact appropriately with supervisors or coworkers; and marked to extreme limitation in responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 462). In support, Dr. Williams wrote: "multiple employment failures due to concerns about thoughts, plans and observed behaviors of coworkers and supervisors that provoke extreme anxiety in patient" and "multiple previous accounts of job failure by patient over the years". *Id.* Dr. Williams noted Plaintiff's judgment was impaired, in that Plaintiff "over

8. The form defines a "mild" limitation as: "a slight limitation in this area, but the individual can generally function well"; a "moderate" limitation as "more than a slight limitation in this area but the individual is still able to function satisfactorily; a "marked" limitation as a "serious limitation in this area . . . [with] a substantial loss in the ability to effectively function; and an "extreme" limitation as a "major limitation in this area . . . [with] no useful ability to function in this area." (Tr. 461).
9. For this final category (making judgments on complex work-related decisions), Dr. Williams checked both the "marked" and "extreme" boxes, and made an indication between the two. (Tr. 461).

interprets intentions of others in a threatening way." *Id.* Dr. Williams opined Plaintiff's symptoms had been present since 1993. *Id.*

In November 2013, Ms. Rossow completed a "Daily Activities Questionnaire". (Tr. 466-67). Ms. Rossow noted Plaintiff lived alone in a home owned by his parents, and had no barriers to independent living. (Tr. 467). He got along well with his parents, but was estranged from his siblings, and "avoids contact with neighbors because of gossip." *Id.* He saw his parents daily, his siblings at family functions, and talked daily with friends. *Id.* Ms. Rossow noted Plaintiff "reported he gets along well [with coworkers and supervisors] until they start playing games or gossip about him". *Id.* He had been disciplined at work in the past "for exchange of words" and "was told to take 2-3 weeks off to deal with stress." *Id.* Ms. Rossow noted Plaintiff had "poor tolerance for stress, experiences frequent headaches and perceives persecution." *Id.* She opined Plaintiff's ability to prepare food was "limited by income" but "should improve now that he has food stamps." (Tr. 466). He had no impairment in the ability to perform household chores, drive or take public transportation, and banking and bill paying. *Id.* He "could improve" his personal hygiene. *Id.* She opined Plaintiff regularly kept his appointments, complied with treatment goals, actively participated in treatment, and was working to improve coping skills. *Id.*

In September 2014, Dr. Williams wrote a letter regarding Plaintiff's condition:

> Mr. Fitzenreiter has been a patient of mine for many years at Fulton County Health center, receiving treatment for chronic mental illness which puts him at a significant disadvantage in terms of being able to obtain and maintain employment. He has substantial and longstanding issues with trust, even with family members. His social anxiety causes such disruption in his life that he barely even leaves home unless he absolutely has to. Additionally, he suffers from panic disorder and chronic low grade depressed mood over the course of many years known as dysthymia.

> It is my opinion beyond reasonable doubt that despite optimum treatment, he maintains a sufficient burden of social disability that it precludes him from being able to engage in meaningful employment in the service of addressing his day to day financial responsibilities.

(Tr. 552).

In November 2013, state agency reviewing physician Denise Rabold, Ph.D., MA, CCC, SLP, reviewed Plaintiff's records on behalf of the state agency. (Tr. 93-98; 107-13). She concluded Plaintiff had mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 93). She concluded Plaintiff could: 1) understand and recall simple concrete 1-2 step instructions, but may need occasional repetition; 2) perform simple concrete 1-2 step tasks immediately without the demands of fast pace or high production rates and would need limited interaction/involvement with others; 3) interact infrequently and superficially with others and would do best with a small familiar group; and would 4) need a predictable static work environment where changes can be easily explained. (Tr. 97-98; 111-13).

In March 2014, state agency physician Karla Voyten, Ph.D. reviewed Plaintiff's records on behalf of the state agency and affirmed Dr. Rabold's conclusions. (Tr. 125-32).

VE Testimony

A VE also appeared and testified before the ALJ. (Tr. 77-86). When the ALJ asked the VE to assume a hypothetical individual limited in the way ultimately found in Plaintiff's residual functional capacity ("RFC"), the VE testified such an individual could perform jobs of order picker, counter supply worker, or laundry worker. (Tr. 79-84).

ALJ Decision

In her written decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014, and had not engaged in substantial gainful activity since the alleged onset date. (Tr. 13). She found Plaintiff had severe impairments of panic disorder

without agoraphobia, dysthymic disorder, type II diabetes mellitus, and left shoulder arthritis; but these impairments did not meet or medically equal a listed impairment either singly or in combination. (Tr. 13-15). The ALJ then concluded Plaintiff had the following mental RFC:

> The claimant can understand, remember and carry out simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work). He can understand, remember and carry out simple work-related decisions. Changes should be well explained and introduced slowly. The claimant also needs goal and plans outlined. He can frequently interact with supervisors. He can interact with coworkers and the public superficially meaning the ability to greet people, refer coworkers/public to other coworkers regarding customers' demands or requests, answer questions about time of day and give directions to the bathroom. Superficial interaction would not involve the claimant dealing directly with demands or problems of the coworker or customer.

(Tr. 17).[10] The ALJ then concluded Plaintiff could not perform any past relevant work (Tr. 24), but there were other jobs existing in significant numbers in the national economy that he could perform (Tr. 25). Therefore, the ALJ concluded Plaintiff had not been under a disability from his alleged onset date through the date of the ALJ's decision. (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*,

---

10. The RFC also included physical restrictions which are not at issue here. *See* Tr. 17.

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) &

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in two ways: 1) by not finding he met Listings 12.04 and

12.06; and 2) by violating the treating physician rule with respect to Dr. Williams's opinions. The

Commissioner responds that the ALJ's decision comports with the law, and is supported by

substantial evidence in both regards. For the reasons discussed below, the undersigned affirms the

decision of the Commissioner.

Listing Analysis

Plaintiff contends the ALJ erred in finding he did not meet the criteria for Listings 12.04

(Affective Disorders) and 12.06 (Anxiety Disorders) because, he alleges, he meets the "paragraph

A" criteria of the listings, and the record evidence shows marked restriction in at least two areas

as required by "paragraph B" of both listings. The Commissioner responds that the ALJ's

determination is supported by substantial evidence that Plaintiff did not have such marked

restrictions.

If a claimant meets or equals the requirements of a listed impairment, then the claimant is

considered disabled. 20 C.F.R. §§ 416.920(d); 404.1520(d). In order to determine whether a

claimant's impairment meets a listing, the ALJ may consider all evidence in a claimant's record.

*See* 20 C.F.R. §§ 404.1520(a)(3); 404.1526(c). A claimant's impairment must meet every element

of a Listing before the Commissioner may conclude that he is disabled at Step Three of the

sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Duncan v. Sec'y of Health &*

*Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the

elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984).

Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the

Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health*

*& Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting

the conditions of a Listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989)

(Commissioner's decision affirmed where medical evidence "almost establishes a disability"

under Listing).

The relevant Listings provide:

**12.04 Affective Disorders**: Characterized by a disturbance of mood,
accompanied by a full or partial manic or depressive syndrome. Mood refers to a
prolonged emotion that colors the whole psychic life; it generally involves either
depression or elation.

The required level of severity for these disorders is met when the requirements in
both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of
the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions, or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

* * *

**12.06 Anxiety Related Disorders**: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace;
    or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06.[11]

Thus, to meet the requirements of Listing 12.04 and Listing 12.06, a claimant must meet the requirements listed in *both* paragraphs A and B of each Listing, and the "paragraph B" criteria are the same.[12] The ALJ concluded at Step Two that Plaintiff had severe impairments of panic disorder without agoraphobia and dysthymic disorder. (Tr. 13). At Step Three, she concluded Plaintiff did not meet "paragraph B" criteria, and thus did not satisfy the Listings. (Tr. 15-16). After careful review of the record, the undersigned finds the ALJ's decision supported by substantial evidence as detailed below.

*Activities of Daily Living*

Regarding activities of daily living, the regulations provide:

Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00.

---

11. The mental disorder listings were subsequently amended, effective in January 2017. *See* Soc. Sec. Admin*., Revised Medical Criteria for Evaluating Mental Disorders*, 81 F.R. 66138-01, 2016 WL 5341732 (Sept. 26, 2016) (effective Jan. 17, 2017). Because the ALJ's decision in October 2015 is prior to the amendment, the undersigned references the prior version of the Listings herein.
12. Alternatively, the claimant may meet the Listing by satisfying the criteria is Paragraph C. *See* 20 C.F.R. Pt.404, Subpt. P, App'x 1, §§ 12.04, 12.06. The undersigned does not address Paragraph C here because Plaintiff does not take issue with the ALJ's finding in this regard.

The ALJ found Plaintiff had mild limitations in activities of daily living (the first of the "paragraph B" criteria), explaining:

> In October 2013, the claimant's therapist Julia Rossow, MSW, noted that while he could improve his personal hygiene, he had no problem in performing household chores, taking public transportation or bill paying (Ex. 5F/3). The claimant testified that he visited his mother, cooked her light meals, and drove her to appointments. He was able to care for his tomato plants, go grocery shopping and live independently. While the claimant had motivation issues to take care of his daily personal hygiene, his ability to perform a wide range of daily activities shows that he has mild restrictions in activities of daily living.

(Tr. 16). Substantial evidence supports this finding. As the ALJ pointed out, Plaintiff's treating counselor opined he had no difficulty with household chores, driving or taking public transportation, or managing finances. (Tr. 466). Additionally, the ALJ pointed to Plaintiff testimony about his ability to perform daily activities. *See* Tr. 58-60. A review of the record as a whole shows Plaintiff was generally able to take care of his own needs, and independently performed a range of daily activities without assistance. *See, e.g.*, Tr. 302-09 (2013 function report noting Plaintiff lived alone, and performed activities such as shopping, preparing meals, feeding and caring for pets, yard work, laundry, and caring for personal hygiene—but noting he did not always wear clean clothes or wash his hair); Tr. 449 (April 2012 treatment note that Plaintiff "continues to do what he can . . . to help out his parents and keep up with the property"); Tr. 466-67 (Ms. Rossow's October 2013 opinion that Plaintiff was able to prepare food, do household chores, drive/take public transportation, and manage finances, but "could improve person[al] hygiene").

The undersigned notes that while Plaintiff points to some contrary evidence (primarily consisting of Plaintiff's testimony about difficulties with other people) (Doc. 12, at 11; Doc. 17, at 2-3), substantial evidence also supports the decision of the ALJ, and it is not this court's role to re-weigh that evidence. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.

2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."). Notably, the ALJ did not find Plaintiff had *no* limitation in his area, but rather found mild limitation, acknowledging Plaintiff's hygiene issues. (Tr. 16). Substantial evidence therefore supports the ALJ's finding in this domain.

*Social Functioning*

Regarding social functioning, the regulations provide:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

The ALJ concluded Plaintiff had moderate difficulties in social functioning (the second of the "paragraph B" criteria), explaining:

> While the claimant had a somewhat irritable attitude, he was cooperative at numerous medical visits (Ex. 3F/4, 8F/10; 12F/23). He also had a history of feeling like people in his community had a less than positive orientation towards him and treated him poorly (Ex. 3F/17-18). While the claimant had a good relationship with his mother and had two friends whom he spoke with daily, he was estranged from his siblings and avoided contact with his neighbors (Ex. 5F/4). The claimant's limited social interactions outside of his mother and two friends demonstrate that he has moderate difficulties in maintaining social functioning.

(Tr. 16). Substantial evidence supports this finding. As the ALJ noted, Plaintiff was often noted to be cooperative at medical visits with various providers, suggesting he had no difficulty interacting

with them. *See* Tr. 442 (August 2013 note from Dr. Williams that Plaintiff's attitude was "cooperative yet somewhat irritable as well"); Tr. 519 (October 2013 note from Ms. Rossow that "Client was cooperative with diagnostic assessment process and agreeable to follow treatment recommendations".); Tr. 601 (August 2014 treatment note from Dr. Krueger noting Plaintiff was "Alert, Oriented, Cooperative"); *see e.g., Green v. Comm'r of Soc. Sec.*, 2016 WL 3230675, at *12 (N.D. Ohio) (finding supported an ALJ's opinion that Plaintiff was not markedly limited in social functioning, in part due to "the fact that [the claimant] has interacted appropriately with all medical providers").

The ALJ also acknowledged that Plaintiff did have social functioning limitations, citing his estrangement from his siblings, limited social interactions, and feelings about how he was viewed by community members. *See* Tr. 456 (July 2009 treatment note from Dr. Williams describing interpersonal difficulties at work, and Plaintiff's report that "he ended up having to leave there because it was becoming extraordinarily more difficult in light of the fact that there was an ongoing perception from many of the employees that the patient was 'a narc'."); Tr. 455 (April 2010 treatment note from Dr. Williams noting Plaintiff "continues to have some issues with feeling as though there are others within the community that have less than a positive orientation towards him" and "[t]he patient seems to have some degree of suspicion regarding others within the community which may or may not be public knowledge issues"); Tr. 467 (October 2013 questionnaire from Ms. Rossow noting Plaintiff got along well with his parents, was estranged from his siblings, and avoided contact with neighbors "because of gossip"). Additionally, Plaintiff himself reported he got along with supervisors "very well . . . most of the time but not always." (Tr. 308).

The ALJ here balanced this with other evidence in the record—that Plaintiff had friends, and interacted appropriately with medical providers—and concluded Plaintiff was limited in this regard, but not to a marked degree.[13] *See* Tr. 16. Based on this record, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff has no more than moderate impairment in social functioning. *See, e.g., Vanarnam v. Comm'r of Soc. Sec.*, 2014 WL 1328272, at *19 (E.D. Mich.) (finding substantial evidence supported ALJ's finding of moderate restrictions in social functioning where: (1) medical source statements described the plaintiff as "polite and cooperative", "pleasant", and "calm and affable"; (2) the plaintiff lived with his wife and children during the time before his date last insured; and (3) anger at work was the result of "pressure to work rather than being attributable to any clinical impairment").

As with the prior limitation, Plaintiff's objection consists primarily of pointing to evidence in the record to support greater restrictions. (Doc. 12, at 11; Doc. 17, at 3-4). Additionally, Plaintiff points to the marked difficulties opined by Dr. Williams in this category. *Id.* (citing Tr. 461-62). However, as discussed below, the ALJ provided good reasons for partially discounting Dr. Williams's opinion.[14] And, for the same reasons as discussed above, it is not this Court's role to

---

13. A "moderate limitation", is not defined by agency regulations, but is generally defined as not precluding an activity. *See Cantrell v. McMahon*, 227 F. App'x 321, 322 (5th Cir. 2007) (upholding the definition of "moderate" as "there are some moderate limitations, but the person can still perform the task satisfactorily"); *Ziggas v. Colvin*, 2014 WL 1814019, at *6 (S.D. Ohio) ("[C]ourts generally agree that although the Social Security regulations do not define a 'moderate limitation,' it is commonly defined on agency form 'as meaning that the individual is still able to function satisfactorily.'") (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 888 (8th Cir. 2006)).

The regulations do, however, define a "marked" limitation as "more than moderate but less than extreme" and one that "interfere[s] seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, § 12.00C.

14. Plaintiff argues it was error for the ALJ not to discuss Dr. Williams's opinion regarding marked limitations at Step Three. However, 1) Plaintiff points to no authority requiring an ALJ to do so; and 2) when the ALJ's decision is considered as a whole—including the detailed Step Three analysis, and the fact that the ALJ discussed Dr. Williams's treatment records therein, and records

re-weigh the evidence, so long as the ALJ's conclusion is supported by substantial evidence. *See Reynolds*, 424 F. App'x at 414; *Jones*, 336 F.3d at 477. The ALJ's conclusion was supported by substantial evidence in the record.

*Concentration, Persistence, or Pace*

Regarding concentration, persistence, or pace, the regulations provide:

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00.

The ALJ found Plaintiff had moderate difficulties with concentration, persistence, or pace, explaining:

In August 2013, the claimant had good attention (Ex. 3F/4). However, in October 2013, Ms. Rossow explained that the claimant's persecutory thoughts and beliefs negatively affected his judgment, insight and attention and concentration as he thought too much about what games others were playing with him (Ex. 5F/14, 18). The claimant's problems understanding instructions and intrusive thoughts, but demonstrated good attention shows that he has moderate difficulties in maintaining concentration, persistence or pace (Ex. 7E/8, Hearing Testimony).

(Tr. 16). Substantial evidence supports this finding. As the ALJ cited, Plaintiff was noted to have good attention by Dr. Williams in August 2013. (Tr. 442). The ALJ also acknowledged Plaintiff's persecutory thoughts, as evidenced by the record, and his testimony. *See* Tr. 477 (Ms. Rossow's October 2013 assessment note that Plaintiff was "unable to work due to invasive thoughts,

---

and opinion in the RFC analysis—the Court finds no error in the ALJ's Step Three analysis by virtue of the fact that Dr. Williams's opinion was not specifically mentioned there.

delusions of paranoia that people 'play' him and are gossiping about him"); Tr. 44-46, 67, 69-71 (hearing testimony).

Moreover, although there are additional records supporting Plaintiff's paranoia and persecutory thoughts, in the record, *see, e.g.,* Tr. 454-55, 442, 476-77, 526, there are also notations to the contrary, *see, e.g.,* Tr. 442 (August 2013 note from Dr. Williams that Plaintiff had "some ideas of reference, although [he could] not say [it] breaches into psychosis" and that Plaintiff's thought content was "logical, with some ideas of reference"); Tr. 561-62 (July 2014 note from Dr. Williams that Plaintiff had "some fairly well developed and persistent beliefs with a persecutory theme although not so unusual as to characterize them as delusional"); Tr. 555 (May 2015 note that Plaintiff's "[t]hought process [was] reality based"); Tr. 774 ("Thought process reasonable, no evidence of rank paranoia or any delusional content."). There are also substantial notations throughout the record of normal, or near-normal mental status examinations, and a relatively stable mental condition. *See generally* Tr. 442-45, 446-60, 491-92, 495-96, 526-37, 539-43, 555-66, 638-754, 772, 774.

Additionally, Plaintiff's own function report and testimony suggest that he had some limitations related to concentration, persistence, or pace, but not to a marked degree. *See* Tr. 302 ("I don't understand instruction[s] sometimes and get anxious and depressed. I forget thing[s] more."); Tr. 307 (October 2013 function report stating Plaintiff thought he could pay attention for 10-15 minutes, and has difficulty with written and spoken instructions ("[s]ometimes it gets confusing, can't remember as well as I used to" and "[n]ot well can't figure out exactly what the [sic] mean sometimes"); Tr. 53-54 (testimony that he forgot and lost things, but did not need reminders to take his medication, and that he tended "to drift off and think about other things that

[he's] not supposed to be - - shouldn't be - - [he had] a hard time focusing on what [he] should be doing.").

Again, as with social functioning, Plaintiff points to Dr. Williams's opinion that he was more impaired in this regard. *See* Doc. 12, at 11-12 (citing Tr. 461-62). And again, the undersigned notes that, as discussed below, the ALJ provided good reasons for finding Plaintiff less limited than Dr. Williams's opinion suggested.

Overall, Plaintiff's objections to the ALJ's Listing analysis consist primarily of pointing to other evidence in the record, and rely heavily on his own testimony and self-report. *See* Doc. 12, at 11-12; Doc. 17, at 2-5. However, as discussed above, there is substantial contradictory evidence in the record to support the ALJ's decision. Moreover, it is worth reiterating that even if substantial evidence or indeed a preponderance of the evidence supports Plaintiff's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The Court finds such evidence here to support the ALJ's finding of no "marked" restrictions in activities of daily living, social functioning, or with concentration, persistence and pace.[15] Therefore, the "paragraph B" criteria of the applicable listings was not met.[16] As such, the

---

15. Plaintiff does not challenge the ALJ's determination that he had not suffered repeated episodes of decompensation (Tr. 16), the final "paragraph B" criterion.

16. Plaintiff argues the ALJ somehow erred in failing to explicitly address whether he met the "paragraph A" criteria of the Listing. *See* Doc. 17, at 2, 5. This was not error, however, because the ALJ found Plaintiff could not satisfy the "paragraph B" criteria, and *both* must be satisfied for a claimant to equal a listing. *See Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017) ("As a preliminary matter, Bowman offers no argument that she suffers from the paragraph A symptoms for each of the three listings, nor did the ALJ address this issue. But even assuming she can meet paragraph A for each listing, she lacks the requisite impairment-related limitations in each listing's paragraph B.") Because the undersigned finds the Commissioner's decision that Plaintiff did not satisfy the "paragraph B" criteria supported by substantial evidence, it is unnecessary to to address Plaintiff's arguments about the "paragraph A" criteria.

Court finds no error in the ALJ's Step Three analysis concluding Plaintiff's mental impairments do not meet the requirements of Listings 12.04 or 12.06.

<u>Treating Physician – Dr. Williams</u>

Plaintiff secondly argues the ALJ erred in her analysis of the opinions of Plaintiff's treating physician—Dr. Williams. The Commissioner responds that the ALJ complied with the applicable regulations and provided the required good reasons for partially discounting Dr. Williams's opinion.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to

the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. The Sixth Circuit has held it sufficient if an ALJ's opinion "indirectly attacks both the supportability of [the treating physician's] opinions and the consistency of those opinions with the rest of the record evidence. *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006); *see also Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010).

The ALJ summarized Dr. Williams's October 2013 assessment, and stated he gave it "partial weight" because it was partially "inconsistent and more limiting than what can be supported by the claimant's overall mental health treatment record" (Tr. 22). Were this all the ALJ had said, the undersigned might have reversed for further explanation, *see, e.g., Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); but it was not. Prior to this statement the ALJ had thoroughly summarized Plaintiff's testimony (Tr. 18), and the mental health evidence—including much from Dr. Williams (Tr. 19). Following this statement assigning partial weight to Dr. Williams's opinion, the ALJ then *again* summarized his findings regarding Plaintiff's limitations, explaining how they supported his RFC finding, which was less limiting than Dr. Williams's opinion:

> As stated earlier, the claimant's ability to perform a wide range of daily activities shows that he has mild restrictions in activities of daily living. His continued persecutory thoughts, tangential thought process, but good attention and logical thought process shows he has moderate difficulties in maintaining concentration, persistence or pace. His limited daily social interactions and persecutory thoughts, but ability to maintain friendships and be cooperative with medical professionals with whom he has contact shows he has moderate difficulties in maintaining social functioning, Besides his alleged 1989 inpatient psychiatric hospitalization, there was no evidence that the claimant had any repeated episodes of decompensation, each of extended duration.

The claimant continued to have persecutory beliefs that family members and coworkers were plotting against him in some way that caused him to over-think his interactions with others. He also experienced tangential thought processes and difficulties understanding instructions without them being explained in detail. However, he demonstrated a normal attention span, logical thought content and stabilized mood with treatment. Those combined symptoms would limit him to understanding, remembering and carrying out simple, routine and repetitive tasks, but not at a production rate pace and simple work related decisions, as he does not possess the mental capacity to handle complex or novel assignments or decision making due to the combined effects of his panic disorder and dysthymic disorder. His history of feeling like coworkers were playing games with him and difficulties following instructions would require that workplace changes be explained and introduced slowly, and goals and plans be outlined as to not exacerbate his anxiety levels (Ex. 5F/4, 13-14; 6F/6; 8F/9, 17; 11F/3, 9; 13F/38, 67, 102).

The claimant's documented history of having difficulties getting along with coworkers and family members due to paranoid feelings of being plotting [sic] against, but demonstrated ability to be cooperative during medical visits and maintain friendships show that he could frequently interact with supervisors as he had not demonstrated consistent problems dealing with bosses or supervisors (Ex. 7E/9; 3F/4; 12F/23). However, his persecutory and distrustful view of others, frustration when dealing with coworkers, and history of requiring anger management would require that he only superficially interact with coworkers and the public as the claimant's mental health record showed that he had interpersonal conflict when required to deal with others directly and not in passing due to his paranoid and intrusive thoughts. Therefore, he could greet people, refer coworkers/public to other coworkers regarding customers' demands or requests, answer questions about time of day and give directions to the bathroom.

(Tr. 23). In so doing, the ALJ implicitly addressed both the consistency and supportability of Dr. Williams's opinion. *Nelson*, 195 F. App'x at 470-71.

As another court explained, "[t]he ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather the ALJ analyzed the medical evidence and explained how it supported his ultimate RFC determination." *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940, *12 (N.D. Ohio). The same is true here. In both analysis preceding and analysis following the ALJ's assignment of weight to Dr. Williams's 2013 opinion, the ALJ

explained her weighing and analysis of the evidence—including Dr. Williams's treatment notes—and why that evidence showed Plaintiff was less limited than Dr. Williams opined. *See* Tr. 18-24.

And the ALJ's reasoning is supported by substantial evidence in the record. The ALJ incorporated Dr. Williams's opinion that Plaintiff could not understand, remember or carry out complex work-related decisions, and therefore limited Plaintiff in the RFC to simple, routine, and repetitive tasks that were not at production-rate pace. (Tr. 17). The ALJ discounted Dr. Williams's findings of marked restrictions in the ability to interact with supervisors and coworkers, and ability to respond to work situations. The ALJ acknowledged Plaintiff's persecutory thoughts regarding his siblings and coworkers (Tr. 22-23), upon which Dr. Williams based his marked restrictions regarding social interaction (Tr. 462) but contrasted this with records indicating Plaintiff had good attention, logical thought process, and ability to maintain interaction with friends and physicians (Tr. 23); *see also* Tr. 19-20.

This is supported by the evidence cited, and other evidence in the record. The record supports that Plaintiff's condition was regularly reported to be stable, and his mental status examinations relatively unremarkable. *See generally* Tr. 442-45, 446-60, 491-92, 495-96, 526-37, 539-43, 555-66, 638-754, 772, 774. The ALJ also, elsewhere in her opinion, noted Plaintiff's overall conservative course of treatment. *See* Tr. 20 ("yet, his mental health treatment records show that he was stable . . . Overall, this conservative course of treatment is inconsistent with a level of severity that would preclude the claimant from sustaining any work activity.") (citations to Dr. Williams's records omitted). Notably, the ALJ accounted for significant social and attention restrictions within the RFC. *See* Tr. 17.

Moreover, although Plaintiff contends the ALJ failed to consider the length of Plaintiff's treatment with Dr. Williams, a review of her decision indicates otherwise. *See* Tr. 16

(acknowledging Plaintiff's testimony that he was hospitalized for mental issues in 1989); Tr. 19 ("[T]he claimant had a long history of being treated for anxiety with Dr. Williams."); *see also generally* Tr. 16-23 (citing and summarizing many of Dr. Williams's treatment notes).

Next, the ALJ explained she gave "little weight" to Dr. Williams's September 2014 letter, as it was "inconsistent with the overall evidence of record" and because "a disability determination is reserved to the Commissioner pursuant to 20 CFR 404.1527(d)(1) and [the] opinion[] w[as] vague and did not provide a function by function analysis of the claimant's alleged limitations." (Tr. 23). The ALJ is correct that determinations on the ultimate question of disability are reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *see also* SSR 96-5p, 1996 WL 374183, *2 ("[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance."). Plaintiff correctly points out that a treating physician's opinion, even on the question of disability, can still be considered, even if it cannot be given controlling weight. However, the ALJ did so here. (Tr. 23). After stating this opinion was entitled to "little weight", the ALJ again summarized her finding regarding the consistency with the overall record. *Id.* The ALJ also noted the opinion was "vague." *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("Conclusory statements for physicians are properly discounted by ALJs."). And, for the same reasons as noted above, the ALJ's conclusion that Dr. Williams's letter was "inconsistent with the overall evidence of record" is supported by substantial evidence, and provides the required good reasons for discounting it.[17]

---

17. Further, earlier in her decision, the ALJ contrasted the content of letter with later records:

> In September 2014, Dr. Williams stated that the claimant had substantial and longstanding issues with trust even with family members. He barely left his home unless he had to and had a panic disorder and a chronic low-grade depressed mood

The undersigned finds the ALJ thus provided "good reasons", that is reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. The ALJ therefore did not err in applying the treating physician rule—having considered the consistency, supportability, and length of the treating relationship—and her decision is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and therefore affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge

---

over the course of many years (Ex. 10F). However, by May 2015, the claimant reported that he was continuing to do well as his counseling sessions for anger management had helped him. He also believed his medications were helpful. Dr. Williams observed that the claimant's overall appearance was good, his mood was euthymic and his thought processes were reality based.

(Tr. 19).